UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

01 OCT 31 PM 2: 18

SHAWN NIX,  )
  )
    Plaintiff,  )
  )
vs.  )  CV 01-BU-0338-E
  )
NHB INDUSTRIES, INC.,  )  **ENTERED**
  )
    Defendant.  )  OCT 3 1 2001

## MEMORANDUM OPINION

    This case is presently before the Court on Plaintiff's motion for summary judgment (Doc. 47) and Defendant's motion for summary judgment (Doc. 51), as well as Defendant's motions to strike affidavits submitted by Plaintiff (Docs. 66 & 67).

    Plaintiff's second amended complaint alleges that Defendant discriminated against him on the basis of his race.[1]  (Doc. 21)  He contends that his work environment was hostile due to his race and that he was denied a promotion in May 2000 to a G5 position because of his race.[2]  He also alleges a cause of action under

---

[1]Plaintiff's second amended complaint also contains a claim of retaliation. This claim has been dismissed. (Doc. 46)

[2]Plaintiff's second amended complaint also alleges that (1) Plaintiff was passed over for five other job positions – G3 or higher – in favor of a white employee; (2) Plaintiff was passed over for a T3 position in favor of a white employee; and (3) Defendant holds black employees to higher job expectations and assigns them additional duties outside their job descriptions.   Plaintiff, in his brief in opposition to Defendant's motion for summary

the Fair Labor Standards Act ["FLSA"] for unpaid wages.

Both Plaintiff and Defendant contend that they are entitled to judgment as a matter of law on all these claims. For the reasons set forth below, Plaintiff's motion for summary judgment is due to be denied; Defendant's motion for summary judgment is due to be granted in part and denied in part. Defendant's motions to strike are due to be denied.

## I.   **DEFENDANT'S MOTIONS TO STRIKE**

Defendant has filed two motions to strike portions of affidavits submitted by Plaintiff. (Doc. 66 and 67) The only difference between these two motions is that the second motion also moves to strike portions of Plaintiff's affidavit submitted in opposition to Defendant's motion for summary judgment. Therefore, Defendant's first motion to strike (Doc. 66) is due to be denied as moot. Defendant's second motion to strike (Doc. 67) is due to be denied.

Although the Court finds that portions of Plaintiff's affidavit, as well as the affidavits of Parnell Turner, Bruce Johnson, Henry Cunningham, and Victor Wilson, are somewhat vague and speculative and that some of the statements lack a proper foundation, the Court has chosen to consider these affidavits for what they are worth. Therefore, Defendant's motion to strike (Doc. 67) is due to be denied.

---

judgment, admits that he is not pursuing these claims. *See* Doc. 64, pp.1-2, ¶¶ 13-14, 17. Therefore, Defendant's motion for summary judgment is due to be granted as to these claims.

## II.   **MOTION FOR SUMMARY JUDGMENT**

### A.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553; *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission

to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

### B.   STATEMENT OF FACTS

Plaintiff Shawn Nix is a black male.   Defendant NHB Industries, Inc., manufactures residential cabinets for sale to large national retailers. Plaintiff began working for Defendant on February 9, 1999.  Before working for Defendant, Plaintiff had minimal experience operating a forklift or other heavy machinery.  Plaintiff was hired by Defendant as a G2 forklift operator on Defendant's second shift in the lamination department.

The lamination department employs approximately twelve employees, working three shifts.   Those employees are responsible for laminating large quantities of raw board using a large electrical and mechanical press.   The production manager for the lamination department during the relevant time was Robert Hilton-Lee.  The lamination department employees fall into the following employment classifications: T3, G5, and G2/G3.

Plaintiff contends that a T3 is an assistant supervisor for production, who is accountable for the performance of the employees on his shift, including reporting absenteeism and for recommending disciplinary action to the production manager. Defendant contends that T3 employees are not considered supervisors, but they are

responsible for overseeing the operation of the lamination press and the movement of the board through the press, maintaining the work schedule, and insuring the quality of the laminated board.  Defendant's Company Handbook classifies and describes the T3 positions as:

> Maintenance Senior Level and Extremely Technical Machine Operators – Both electrical and mechanical personnel with normally at least ten (10) years of manufacturing maintenance experience or equivalent.  These employees are expected to work independently and lead teams.

Doc. 53, Exh. D, exh. 11, p. 20.  T3 employees are in charge of their shift, and they direct the work of the employees on that shift, and they can initiate discipline. During the events in question, the T-3 employees in the lamination department were Joe Culpepper (white male), Kim Crimm (white male), Tim Byrd (white male), and Henry Cunningham (black male).

A G5 employee is a line operator who reports to the T3 employee on his shift, monitors the production line, makes adjustments to optimize efficiency, loads the paper onto the line, makes any alignment adjustments, carries out quality checks on the product, keeps correct records, and maintains general housekeeping of the area around the lamination line.  While running the lamination line is the responsibility of the T3 employee on that shift, the duties and training for a G5 position and a T3 position are comparable.

The G2/G3 positions are divided into quality inspectors and material handlers. The quality inspector reports to the T3 employee, monitors the rear of the line press,

inspects finished boards according to quality standards, records output, communicates with the G5 employee and the T3 employee on operation of the back end, labels finished stock, and maintains general housekeeping of the back of the line. The material handler takes instruction from and reports to the T3 employee, straps finished boards, moves the stacks to the warehouse, loads raw material onto the line, and maintains general housekeeping around the strapping area.

When Plaintiff was hired he worked with Joe Culpepper, a white male, who was the T3 employee; Wendall Hall, a black male, and Parnell Turner, who worked as G5 employees. In February 2000, Plaintiff volunteered to transfer to the newly-created third-shift because the third-shift provided more money and better fit his childcare needs. Initially, Henry Cunningham, a black male, worked as the T3 employee on third shift and Parnell Turner worked as the G5 employee. Shortly thereafter, Tim Byrd was promoted to the T3 position[3] and Cunningham transferred to the second shift. Temporary employees, Victor Wilson and Milton Baker, both black males, worked with Plaintiff and Byrd on the third shift. Plaintiff later requested a transfer to the second shift, which was granted. He worked with Cunningham and Hall on the second shift.

During his time in the lamination department, Plaintiff received evaluations and warnings that contained constructive criticism of his job performance and his

---

[3]Byrd, a G5, was set up as the temporary T3 on the third shift in February 2000; he was permanently assigned to the T3 position in May 2000.

attendance.  Plaintiff received a warning for insubordination and profanity, as well as a warning for spray painting another employee's name on a wall.

Defendant has a "No Harassment Policy."  The policy provides that it "is the responsibility of every supervisor and manager to communicate this policy with their employees."  Doc. 53, Exh. D, exh. 10, p.1.  Henry Polek, the human resources director, could not recall if he reviewed the "No Harassment" with Plaintiff or other employees in the lamination department.  However, Plaintiff testified that he was aware that Defendant had a policy prohibiting harassment and that he was aware that the policy was posted on the bulletin board.  Doc. 53, Exh. D, p. 101.

 The policy provides that "harassment" includes, but is not limited to, offensive language, jokes, or other verbal graphic or physical conduct; or intimidating, threatening, or offensive behavior relating to an employee's race that would lead a reasonable person to feel uncomfortable.  Conduct in violation of this policy could result in disciplinary action, and the level of discipline is based on the severity of the harassment and the harasser's employment history and may include termination.

There are several reporting avenues available to Defendant's employees that believe they have been subjected to unlawful discrimination or harassment.  These avenues include: (a) reporting the conduct to the employee's supervisor or another member of management; (b) reporting the conduct to the Human Resources Manager; or (c) reporting the conduct to the Plant Manager.  Defendant's anti-harassment policy expressly states: "No supervisor or manager should participate

in such behavior and must take immediate action to stop those who are known to be, or suspected of being, involved in such conduct.  The supervisor must also contact and report the information to the Human Resources Manager."  Doc. 53, Exh. D, exh. 10, p. 2.  Also, to ensure that corrective action is taken, the anti-harassment policy clearly states that, "Anyone who feels the Company has not met its obligations under this policy should contact the Human Resources Manager." *Id.* at 4.  An additional avenue for reporting concerns is available under the Defendant's "Open Door Policy," which is contained in the handbook. Doc. 53, Exh. D, exh. 11, p. 14.  That policy specifically states that complaint procedures (such as those contained in the anti-harassment policy) are published separately and posted in the individual work areas.

Plaintiff contends that he was regularly exposed to conduct in violation of this policy. Defendant denies this contention.  Plaintiff's amended complaint alleges two general incidents that created a hostile work environment: (1) repeated racial epithets and threats from Byrd, which Byrd denies; and (2) racially segregated shifts.[4]  In brief, Plaintiff alleges other incidents of harassment. Because Plaintiff's

---

[4]Plaintiff's Second Amended Complaint states:

8.    During the entirety of his employment with NHB, [Plaintiff] . . . received favorable evaluations, when his evaluations were given.

9.    He currently works as a G3, in the Lamination Department.

10.    During the majority of Mr. Nix's employment with NHB in the Lamination Department, the shift crews have been racially segregated with

amended complaint clearly limits his allegations to these two incidents, other evidence will not be considered by the Court in determining whether Plaintiff's work environment was sufficiently hostile or abusive. *See Craven v. Texas Department of Criminal Justice-Institutional Division*, 151 F. Supp. 2d 757, 770 (N.D. Tex. 2001)("The court further notes that Craven failed to mention . . . any form of retaliation other than the written reprimand, either in her original complaint or amended complaint. The old maxim *expressio unius est exclusio alterius* springs to mind; Craven's allegation of one specific retaliatory act with no mention of other conduct . . . suggests that the written reprimand was . . . the only alleged

---

the white workers being assigned to the day shift and the black workers being assigned to the night shift.

11.    On an almost daily basis, Mr. Nix and other black co-workers heard Tim Byrd, the white supervisor of the day shift in the Lamination Department, use the word "nigger" in various contexts.

12.    At one time, Mr. Nix was assigned to Mr. Byrd's shift.

13.    Mr. Nix was offended by Mr. Byrd using the word "nigger."

14.    Bob Hilton Lee and other members of management have heard Mr. Byrd use racially offensive language, but did nothing.

15.    Mr. Byrd also made racial threats and threatened violence against his black co-workers in Mr. Nix's presence.

16.    Mr. Byrd did not make similar threats towards white employees in the Lamination Department.

17.    The constant barrage of racial remarks and threats by Mr. Byrd affected Mr. Nix's employment.

Doc. 14, ¶¶ 8-17.

"retaliation" upon which she based her claim.  . . . [A]llegations of harassment . . . made during her deposition simply cannot expand the scope of her lawsuit.").

Plaintiff contends that he complained about Byrd's frequent, at-will use of the "N" word to Bob Hilton-Lee. Hilton-Lee denies that he had any complaints of Byrd's use of racial epithets until after August 2000.

On August 7, 2000, the black employees of the lamination department sent a letter to Polek complaining of race discrimination. The letter stated:

> The purpose of this letter is to raise concerns of race discrimination in the assignment of jobs, shifts, pay, discipline and hiring, and to request an immediate investigation into these allegations.
>
> In the lamination department, the employee handbook is not followed with respect to the posting and filling of positions. Qualified black employees are not given an opportunity to bid on jobs, and white employees from outside the company are brought in at a higher grade to fill these positions, despite the standing application of qualified black employees. As a consequence, black employees are put on less desirable shifts. Likewise, the black employees are given twice the work load of similarly situated white employees. This is true across the board and affects all black employees in the lamination department. All hiring decisions and shift assignments for the last two (2) years should be reviewed.
>
> . . .
>
> [B]lack employees are disciplined at a higher rate than white employees in the lamination department. Also, other terms and conditions of employment are handled in a disparate manner between blacks and whites. The shifts in the lamination department are racially segregated. Black employees are asked to assume duties and responsibilities beyond their job descriptions, where white employees are not.
>
> Race discrimination permeates the environment of the lamination

department, and all aspects of the employment environment should be investigated for race discrimination. Numerous black employees have come to you complaining about Bob Hilton Lee's unfair treatment of black employees as compared to white employees, yet no action has been taken. This can only be interpreted as the company's complacency towards and endorsement of racially discriminatory employment practices.

Furthermore, employees who have complained of unfair employment practices have suffered adverse employment action in response to their complaints. The black employees in the lamination department request assurances that they will not suffer any retaliation in response to this complaint.

We request a written report detailing your findings of your investigation and who was involved in the investigation by Monday, August 14. If no investigation is conducted, we would request a written explanation as to why by the same date.

Sincerely,

The Black Employees in the Lamination Department.

Doc. 53, Exh. B, exh. 4. The letter was actually written by Cunningham, with the input and approval of other black employees in the lamination department, including Plaintiff.

In response to the letter, Polek interviewed the black employees in the lamination department. He did not interview Byrd, Hilton-Lee, or other white employees. Plaintiff testified that he had told Cunningham about what he had heard Byrd say; however, the record does not indicate that Plaintiff told Polek about Byrd's use of the "N" word.

Polek told Hilton-Lee about the letter and he asked him not to discuss the

letter with anyone.  Nevertheless, Hilton-Lee told Cunningham that he believed that "hiding behind an anonymous letter was a cowardly thing to do."  Doc. 53, Exh. G, p. 72.  According to Cunningham, Hilton-Lee also stated that "once he found out who exactly wrote the letter, he would be taking actions of his own."  Doc. 53, Exh. O, p. 162.  However, after the letter was sent, Hilton-Lee did not treat Plaintiff differently.

During Polek's investigation of the letter, two black lamination department employees, Hall and Cunningham, indicated to him that Byrd had used the N-word on the job in a joking manner.  Plaintiff and almost all of the black lamination department employees told Polek that Byrd had threatened to "slap Bruce [Johnson's] black ass."  Based upon this information, Polek gave Byrd a final written warning, which stated in  pertinent part, "This is a very serious violation of NHB Policy regarding harassment and will not be tolerated.  Any further breach of Company policy may result in further disciplinary action up to and including termination."  Doc. 53, Exh. H, exh. 6.  Byrd testified that, after he received this warning, he did not "speak to anybody . . . for three months."  Doc. 53, Exh. H, p. 63.  Cunningham testified that after Byrd was disciplined, everything in the lamination department got "hush hush" and he could not recall Byrd saying the "N" word in his presence.  Doc. 53, Exh. O, pp. 155-56.

On or about March 16, 2001, Eddie Scales, a black employee who worked in the lamination department from mid-September 1999 to mid-January 2000, reported

to Polek that he had heard Byrd frequently use the "N" word while he was employed. As a result of Scales's complaint, Polek again interviewed all lamination department employees, including Plaintiff.  During that interview, a number of lamination department employees, including Plaintiff, confirmed to Polek that they had heard Byrd repeatedly use the "N" word.  As a result of Polek's investigation of Scales's complaint, Defendant terminated Byrd based upon his violation of Defendant's policy prohibiting workplace harassment.

During Plaintiff's employment in the lamination department, there was a time when there was an all black second shift and an all white third shift.[5]  Also during this time, the first shift was integrated.  Defendant contends that this was the result of routine hiring progression.  For a time Plaintiff worked on the all black second shift.  Plaintiff contends that when Defendant hired a new white employee for the lamination department, Hilton-Lee assigned Victor Wilson, a black employee, to the all black shift "to keep down confusion." (Doc. 49, Exh. 16, ¶ 30)  Defendant denies that Hilton-Lee ever assigned Wilson to an all black shift or that he ever said that such was done to keep down confusion.  Also, Defendant contends that the second and third shifts were segregated due in part to the granting of requests from black employees to move from the third shift to the second shift.

Plaintiff, who had been working on the third shift, requested a transfer to the

---

[5]Plaintiff's second amended complaint alleges that there was an all-white day shift and an all-black night shift.  The record, however, indicates that the first shift – the day shift – was integrated; the second shift was all black and the third shift was all white.

second shift and such transfer was granted.  Also, Wilson testified that he had asked to move off third shift because of Byrd and that he had asked to move to second shift.  Thus, the racial make-up of the third-shift and the second shift was altered by the transfer of two black employees, including Plaintiff, from the then-integrated third-shift to the second shift.

Defendant maintains a job posting policy that is contained in both the current and former Company Handbooks.  The relevant policies require posting only for "permanent positions."  Vacant jobs that are classified G3 or higher are posted on the main employee bulletin board for three consecutive work days.  Qualified employees are eligible to bid on open positions.  Under the job posting policy, the department supervisor selects the individual whom he believes is most qualified to fill the open position.  According to the policy, "If two or more candidates are equally qualified, then seniority will also be a deciding factor.  Attendance, disciplinary action and written performance appraisals will be considered qualifying factors during the decision process."  Doc. 53, Exh. D. exh. 11, p. 20.

Nix complains that he was not promoted to a G5 position on third-shift in May 2000; the position at issue was awarded to Todd Fuester, a white male. During March or April 2000,  Plaintiff was assigned to the third shift.  Byrd, a G5, was working in a temporary T3 position.  Plaintiff was a G3 employee, but he testified that he often performed the job duties of a G5 employee.  Plaintiff contends that he asked Hilton-Lee about the G5 position on the third shift and that Hilton-Lee told

Plaintiff that he would not get the position. Hilton-Lee denies that Plaintiff ever asked him about a G5 position on the third shift.

Todd Fuester submitted an application for employment on or about May 5, 2000. Fuester's resume and application indicated that he had substantial experience in supervision and in operating heavy machinery, as well as experience and training in maintenance and hydraulics. Though there were no posted positions in the lamination department at that time, Polek was aware that there historically had been a need for experienced technicians in that department. Both Hilton-Lee and Polek interviewed Fuester and were impressed with his qualifications and level of experience. Fuester informed Polek that he would not accept a job with Defendant paying less than $8.00/hour. According to Defendant's wage scale in effect at that time, starting pay for a G5 employee was $8.25/hour. Polek and Hilton-Lee testified that Fuester's skill and ability in sophisticated mechanical operation and repair, was superior to that of any incumbent lamination department employee classified as a G5 or G3, including Plaintiff. Based on Fuester's skills and work experience, and in order to meet his salary requirements, Polek made the decision to offer Fuester a position classified as a G5 starting at $8.25/hour, which Fuester accepted.

Plaintiff also contends that he and a white employee, Dan Rush, received the numerical rating on an evaluation and that Rush received a raise whereas Plaintiff did not. However, Plaintiff complained to Hilton-Lee about not receiving a raise and

Hilton-Lee gave him the raise about two weeks later.

At all times, lamination department employees are compensated for their "working" time spent in the lamination department during the regularly scheduled shift. The lamination department is housed in a building separate from the rest of the plant, approximately 1300 feet from the time clock in the main plant. The walk from the time clock in the main building to the lamination department is between 5 and 15 minutes. An employee in the lamination department is required to be clocked in and present at the lamination facility at the time his shift is scheduled to begin. Plaintiff was not compensated by Defendant for time on the clock that he spent walking to and from the lamination facility and the main building..

On August 31, 2000, the following memorandum was sent by Hilton-Lee to all employees of the lamination department:

> "On time and present for work means an employee is clocked in and at his or hers [sic] place of work when the buzzer sounds for start of shift.
>
> Therefore all Lamination personnel have to be clocked in and down at the Lamination building ready to start work at the start of their shift. You should not leave the production area until the end of the shift.
>
> You should allow 10 mins. to walk to your place of work, (Lamination area) your punch times should reflect this allowance.
>
> For example, if your shift is 6 am to 2 pm. your punch should show 5.50 am - 2.1 pm, this will cover a full 8 hours employment and pay. If your punch records 6 am - 2 pm you will only cover a period of 6.1 am to 1.5 pm.

Doc. 50, Exh. F, exh. 5.  Defendant contends, and Plaintiff disputes, that Polek

repealed this directive on September 4, 2000.  A manual time clock was installed at the lamination facility on or about April 10, 2001.

### B.    HOSTILE ENVIRONMENT

The Court finds that there are disputed issues of material fact as to whether Plaintiff was subjected to a hostile work environment and whether Defendant is entitled to a *Faragher* affirmative defense and that neither party is entitled to judgment as a matter of law.[6]  Therefore, Plaintiff's motion for summary judgment and Defendant's motion for summary judgment with regard to Plaintiff's hostile environment claim are due to be denied.

### C.    PROMOTION

Plaintiff contends that Todd Fuester was given a G5 position for third shift in May 2000.  Plaintiff contends that, contrary to Defendant's policy, this position was not posted and he was not allowed to apply for this position.  However, he contends that he notified Hilton-Lee of his interest in a G5 position.  Plaintiff alleges that he was denied the promotion on the basis of his race.

----

[6]The Court notes that Plaintiff's amended complaint limits his allegations of a hostile work environment to conditions created by racially segregated shifts and racial epithets made by Tim Byrd.  *See* Doc. 14, ¶¶ 10-14.  However, on summary judgment, Plaintiff also contends the following conduct attributed to the hostile environment: disparate discipline with regard to Defendant's attendance policy, disparate treatment of black workers by Defendant's security, and racial remarks made by employees other than Byrd.  These incidents were not included in Plaintiff's amended complaint and cannot be read into his amended complaint.  Because Plaintiff's amended complaint clearly limits the incidents creating a hostile environment to segregated shifts and Byrd's alleged racial epithets, the other incidents alleged by Plaintiff have not been considered by the Court as contributing to the alleged hostile work environment.

Plaintiff must establish four elements of a prima facie case for a failure to promote claim: (1) Plaintiff is a member of a protected class; (2) Plaintiff was qualified for and applied for the available position; (3) Plaintiff was rejected despite his qualifications; and (4) Defendant filled the position with a person outside the protected class or continued to seek other applicants after rejecting Plaintiff. *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir.1998), *cert. denied*, 528 U.S. 809, 120 S. Ct. 39, 145 L. Ed. 2d 36 (1999). If the employer does not post the positions, Plaintiff is not required to show that he applied for the position. *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1130-31 (11th Cir.1984). If an employer fails to use some sort of notice procedure -- such as posting, it has a duty to consider everyone who might be interested in the position. *Hanley v. Sports Authority*, 143 F. Supp. 2d 1351, 1358 (S. D. Fla. 2000).

Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. "Although this burden is not 'onerous,' neither is it a mere formality. The defendant may not satisfy its burden by presenting a hypothetical reason for the employment decision in question; instead, it must raise 'a genuine issue of fact as to whether it discriminated against the plaintiff' by making that decision" *Walker v. Mortham*, 158 F.3d 1177, 1185 (11th Cir. 1998)(quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 255, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).

For purposes of summary judgment, the Court assumes that Plaintiff has established a prima facie case of race discrimination with regard to his non-selection for the G5 position awarded Fuester.  Defendant contends that Fuester was hired because Polek and Hilton-Lee were impressed with his experience and training with regard to heavy machinery, maintenance, and hydraulics.  It contends that there was no open position in the lamination department at that time, but the department had a historical need for experienced technicians.  Therefore, Defendant contends that Polek and Hilton-Lee decided to offer Fuester employment, and Fuester was classified as a G5 employee based on his salary demands, not on his job duties.  Defendant does not contend that it hired Fuester based on his qualifications *as compared to* Plaintiff's qualifications.   Nevertheless, Defendant contends that "Fuester's skill and ability to perform sophisticated mechanical operation and repair [were] superior to those of any incumbent Lamination employee classified as a G5 or less, including [Plaintiff]."  Doc. 53, Exh. B, ¶ 27.

Plaintiff contends that Defendant cannot offer as its legitimate, nondiscriminatory reason the "relative" qualifications of Plaintiff and Fuester because Defendant cannot prove that it considered Plaintiff for the position.  Doc. 64, p. 55 (citing *Mays v. Union Camp Corp.*, 114 F. Supp. 2d 1233, 1242 (M.D. Ala. 2000)(citing *Joshi v. Florida State University Health Center*, 763 F.2d 1227, 1235 (11th Cir. 1985)("if the employer does not consider the plaintiff's qualifications at the time that the decision is made, the employment decision cannot be defended on the

basis of relative qualifications"))). Plaintiff is correct that Defendant cannot rely on the "relative qualifications" of Plaintiff and Fuester because Defendant did not make its decision based on consideration of Plaintiff's qualifications as compared to Fuester's qualifications. *Turnes v. AmSouth Bank, N.A.*, 36 F.3d 1057, 1061 (11th Cir. 1994)("[A]n employer may not satisfy its burden of production by offering a justification [that] the employer either did not know or did not consider at the time the decision was made." (citing *Burdine*, 450 U.S. at 257, 101 S. Ct. at 1095-96; *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 925 (11th Cir.1990); *Joshi*, 763 F.2d at 1235)). However, Defendant does not offer "relative qualifications" as its articulated reason for hiring Fuester.  Defendant's articulated reason is that it hired Fuester because it desired the unique skills and abilities he offered; it also contends that he was classified as a G5 in order to meet his salary demand.  It does not contend that Fuester was hired to fill a particular G5 position on the third shift; it contends that he was offered employment because of a historical need for "technicians" in the lamination department.[7]  The Court finds that Defendant has met its burden of production and has articulated a legitimate, nondiscriminatory reason for its decision to hire Fuester.

    If the employer meets this burden of production, the plaintiff must then

---

[7]Plaintiff argues that Fuester performed the job duties of a G2, but he was paid the starting salary of a G5. However, he has not made a discriminatory pay claim alleging that he and Fuester performed the same work and he was paid less than Fuester on the basis of his race.

establish that the defendant's proffered reasons for its decision are pretextual. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000). "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." *Chapman v. AI Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000)(en banc)(citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir.1997)(requiring a plaintiff to rebut "all of the defendant's proffered nondiscriminatory reasons for its actions" to avoid judgment as a matter of law), *cert. denied sub nom., Combs v. Meadowcraft Co.*, 522 U.S. 1045, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998)).

Plaintiff contends that his qualifications exceeded Fuester's qualifications because Fuester did not have any experience with the lamination press and Plaintiff had worked in the lamination department for over a year at the time.  He claims, "[T]he facts suggest that [Defendant]'s articulated reason for placing Mr. Fuester in the G5 position is pretextual because [Plaintiff] was in a better position to perform the G5 duties than Mr. Fuester."  Doc. 64, p. 56. Plaintiff has not disputed that Fuester had impressive experience and training with regard to heavy machinery, hydraulics, and maintenance, nor has he presented any evidence to dispute the fact that Fuester was classified as a G5 because of his salary demands, and not

because he was hired to perform the job duties of a G5 employee.[8]   Therefore, Plaintiff has not presented evidence that Defendant's articulated reason for its decision to hire Fuester and to classify him as a G5 is a pretext for unlawful race discrimination.

Defendant's motion for summary judgment as to Plaintiff's promotion claim is due to be granted and Plaintiff's motion for summary judgment as to the this claim is due to be denied.  The Court finds no disputed issues of material fact and that Defendant is entitled to judgment as a matter of law.

### D.    FAIR LABOR STANDARDS ACT

In his amended complaint, Plaintiff claims that he is not paid for the time it took him to walk from the location of the time clock in the main building to the lamination building where he actually works.  Plaintiff relies upon *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946) to support his position that such time is compensable.  However, in response to the *Anderson* decision, Congress passed the Portal-to-Portal Act, which states, in pertinent part:

(a) Activities not compensable

[N]o employer shall be subject to any liability or punishment

---

[8]Indeed, Plaintiff asserts that Fuester did not perform the duties of a G5 employee. Plaintiff contends, "Mr. Fuester did not know how to run the Lamination Press. Despite Mr. Fuester's classification and pay as a G5, he did not perform the duties and responsibilities of a G5. Mr. Fuester performed the duties and responsibilities of a G2 Quality Inspector, running the back of the Lamination Press." Doc. 48, p. 11 (footnotes omitted).

under the Fair Labor Standards Act of 1938 . . . on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947 –

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform . . . .

29 U.S.C. § 254(a)(1).

Pursuant to the Portal to Portal Act, Plaintiff is not entitled to compensation for the time spent walking to the place of his "principal activity," which is the lamination department. *See United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1120-21(10th Cir. 1999); *Carter v. Panama Canal Co.*, 463 F.2d 1289, 1292-94 (D.C. Cir.), *cert. denied*, 409 U.S. 1012, 93 S. Ct. 441, 34 L. Ed. 2d 306 (1972).

Therefore, Defendant's motion for summary judgment as to Plaintiff's FLSA claim is due to be granted and Plaintiff's motion for summary judgment is due to be denied. The Court finds no disputed issues of fact and that Defendant is entitled to judgment as a matter of law.

## **CONCLUSION**

Based on the foregoing, Plaintiff's motion for summary judgment (Doc. 47) is due to be denied; Defendant's motion for summary judgment (Doc. 51) is due to be granted in part and denied in part; Defendant's motion to strike portions of affidavits submitted by Plaintiff (Doc. 66) is due to be denied as moot; and Defendant's motion

to strike portions of affidavits submitted by Plaintiff (Doc. 67) is due to be denied.

The Court finds disputed issues of material fact as to Plaintiff's racially hostile work

environment claim and that neither party is entitled to judgment as a matter of law

as to this claim.  However, with regard to Plaintiff's promotion claim and his FLSA

claim, the Court finds no disputed issues of material fact and that Defendant is

entitled to judgment as a matter of law.

The Court will enter a separate order, contemporaneously herewith, in

accordance with this memorandum opinion.

DONE this _____ day of October, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE